997 S.W.2d 474 (1999)
Albert CINELLI, Appellant,
v.
Thomas G. WARD, Appellee.
Kentucky Data Link, Inc.; Wright Businesses, Inc.; Arthur Wright; and A.D. Wright, Appellants,
v.
Thomas G. Ward, Appellee.
Nos. 1997-CA-001578-MR, 1997-CA-001579-MR.
Court of Appeals of Kentucky.
January 8, 1998.
Rehearing Denied March 12, 1999.
Discretionary Review Denied by Supreme Court August 18, 1999.
*475 Keith Moorman, Medrith Lee Hager, Lexington, KY, for Appellant/Cinelli.
John R. Leathers, Stephen G. Allen, Lexington, KY, for Appellants/Kdl, Wright Businesses, et al.
Mark J. MacDougall, Tracy B. McKibben, Washington, D.C., Thomas L. Gabelman, Kevin Matthews, Cincinnati, OH, for Appellee/Ward
Before HUDDLESTON, KNOPF, and MILLER, Judges.

OPINION
MILLER, Judge.
Albert Cinelli brings Appeal No.1997-CA-001578-MR from a March 27, 1997, judgment of the Fayette Circuit Court entered upon a jury verdict. Kentucky Data Link, Inc., Wright Businesses, Inc., Arthur Wright, and A.D. Wright bring Appeal No.1997-CA-001579-MR from the same judgment. We reverse on both appeals.
The facts are these: Arthur Wright and A.D. Wright (the Wrights) were sole shareholders of two family-owned corporations: Wright Businesses, Inc. (WBI), and Kentucky Data Link, Inc. (KDL). The entities were engaged in the telecommunication business. WBI and KDL were in default on a loan agreement with Communications Credit Corporation. It appears, however, that the Wrights were not exposed to personal liability thereon. The Wrights sought to raise capital to avert the imminent foreclosure of their businesses. In such vein, the Wrights began negotiating with appellee, Thomas G. Ward (Ward), to sell the controlling interests of WBI and KDL. In furtherance thereof, they entered into a "no-shop" agreement, which prevented the Wrights from negotiating with third parties. The no-shop *476 agreement expired in September 1995. On September 15, 1995, the parties entered into an "Agreement" (the Agreement).[1] The Agreement's legal import is a matter of much contention between the parties and forms the underlying legal basis of the appeals before us.
In its most basic form, the Agreement contemplated that at a future date Ward would "lend" to the Wrights $2.65 million, which would be evidenced by a promissory note.[2] At Ward's option, the promissory note could be converted into stock representing 54% of WBI's and KDL's outstanding shares. Needless to say, the proposed transaction between the parties never took place. It is asserted that negotiations reached an impasse over three basic issues:
(1) whether the Wrights would accept personal responsibility for any breaches [sic] of warranty or representation made by Data Link or Wright Businesses;
(2) whether the Wrights would accept employment provisions which allowed for them to be summarily terminated from the companies they created and developed; and
(3) whether the Wrights would agree to allow Ward to have day-to-day control over Data Link and Wright Businesses (in addition to majority stock control).
In any event, by letter dated January 12, 1996, the Wrights notified Ward that negotiations were terminated. It appears that the Wrights, sometime in November 1995, entered into negotiations with appellee, Albert Cinelli (Cinelli). On January 15, 1996, Cinelli and the Wrights entered into a contract whereby Cinelli acquired 51% of WBI's and KDL's outstanding shares in exchange for $3 million.
On March 1, 1996, Ward filed the instant action against the Wrights for breach of the Agreement, for breach of the implied duty of good faith and fair dealing, and for conspiracy to deprive him of an advantageous business relationship. Cinelli was also named as a defendant for tortious interference with existing and prospective contractual relationships. The jury ultimately returned a verdict in favor of Ward in the amount of $987,000.00 against the Wrights and $867,000.00 against Cinelli. These appeals followed.

APPEAL NO.1997-CA-001579-MR
The Wrights contend that the circuit court committed reversible error by not granting them a judgment upon their motion for directed verdict. Ky. R. Civ. P. (CR) 50.01. Specifically, they contend that the Agreement was unenforceable under Kentucky law.
It is well established that construction and interpretation of a written instrument are questions of law for the court. See Morganfield National Bank v. Damien Elder & Sons, Ky., 836 S.W.2d 893 (1992). We review questions of law de novo and, thus, without deference to the interpretation afforded by the circuit court. Cf. Louisville Edible Oil Products, Inc. v. Revenue Cabinet Commonwealth of Kentucky, Ky.App., 957 S.W.2d 272 (1997). There exists much controversy concerning whether the Agreement was an "agreement to agree" or a binding contract to sell KDL's and WBI's majority interests. The Wrights, of course, contend that the Agreement was merely an agreement to agree, while Ward believes it constitutes a binding contract to sell. Resolution of this appeal revolves around the proper construction of the document.
Provision 1 of the Agreement specifically provides that "[s]ubject to the terms and conditions set forth herein, Ward shall loan to KDL and WBI, on the Closing Date, an aggregate principal amount of $2,650,000. . . ." In exchange for the "loan," Ward was given the right to acquire 54% of KDL's and WBI's outstanding stock *477 shares. It must be emphasized that the sale of the majority interests was to take place at a specific future time designated as the "Closing Date". Provision 2 of the Agreement sets forth the closing date as September 29, 1995, "or such other date . . . as the parties shall agree. . . ." Thus, the Agreement essentially contemplated the future sale of KDL's and WBI's majority interests.
It appears that the futurity of the sale resulted from several terms left "open" or unresolved by the Agreement. These terms were to be addressed in future negotiations between the parties. The open terms included day-to-day control of KDL and WBI, the Wrights' personal liability, and particulars of the Wrights' employment contracts. Moreover, the Agreement contemplated that the parties would enter into three additional agreements, that is, an employment agreement, a shareholders' agreement, and a loan purchase agreement. The Agreement's open terms were never resolved by the parties' negotiations, and the additional agreements were, of course, never consummated. At the outset, we conclude that the Agreement's open terms were material. We view these terms as absolutely necessary to the formation of a binding contract to sell KDL's and WBI's majority interests.
The Wrights assert that the unresolved open terms rendered the Agreement indefinite and unenforceable. In support thereof, they cite Walker v. Keith, Ky., 382 S.W.2d 198 (1964), for the following proposition:
"To be enforceable and valid, a contract to enter into a future covenant must specify all material and essential terms and leave nothing to be agreed upon as a result of future negotiations."
Id. at 201 (quoting Johnson v. Lowery, Ky., 270 S.W.2d 943, 946 (1954)). The Walker court concluded that the parties must either agree upon the material terms or supply a "definite method of ascertaining" same. Id. at 202. Ward, however, contends that the unresolved open terms of the Agreement do not render it unenforceable. He asserts that these terms can be supplied by the court and directs our attention to Simpson v. JOC Coal, Inc., Ky., 677 S.W.2d 305 (1984). Therein, JOC Coal entered into an agreement with the majority shareholders of a corporation to purchase their stock. In the agreement, JOC Coal also agreed to "`conclude a similar arrangement with James W. Simpson [the minority shareholder] under which said James W. Simpson will also consent to a similar ammending [sic] of the Agreement.'" Id. at 306-307. Simpson filed an action alleging that JOC Coal failed to negotiate in good faith, thus violating the agreement. The Court of Appeals, holding that the agreement's terms were indefinite and uncertain, refused to enforce same. The Supreme Court reversed by holding:
[Walker v. Keith] is far different in degree of uncertainty from the present case where the contract obligates JOC Coal Companies to undertake to conclude a similar agreement with James W. Simpson, which is subject to a reasonable interpretation as meaning to make Simpson a similar offer for his shares. . . . Unlike Walker, here the promisor's commitment is sufficiently defined to be enforceable.
Id. at 309. As in Simpson, Ward contends that the court can simply supply the Agreement's unresolved open terms. We disagree.
Where an agreement leaves the resolution of material terms to future negotiations, the agreement is generally unenforceable for indefiniteness unless a standard is supplied from which the court can supplant the open terms should negotiations fail. In Simpson, 677 S.W.2d 305, the unresolved material terms were easily determined by reference to the majority shareholders' agreement. Conversely, in Walker, 382 S.W.2d 198, there was no similarly agreed-upon "definite method of ascertaining" *478 such material terms. In the case at hand, the court is not supplied any standard or agreed-upon method with which to supplant the Agreement's unresolved open terms. Absent such standard, any attempt to supply the Agreement's unresolved open terms would be sheer conjecture. We believe the Agreement is essentially too indefinite for the court to view it as an enforceable contract to sell the majority interests in KDL and WBI.
Additionally, we do not believe that the Agreement was intended to constitute a binding contract to buy and to sell the majority interest in KDL and WBI. When construing a contract, it is well established that the court may look to surrounding circumstances and the parties' conduct as a guide. See Jones v. Linkes, Ky., 267 S.W.2d 936 (1954); Dennis v. Watson, Ky., 264 S.W.2d 858 (1954); and Thompson v. Fairleigh, 300 Ky. 144, 187 S.W.2d 812 (1945). It is difficult for us to accept Ward's position that the Agreement was intended to be an iron-clad contract to sell KDL's and WBI's majority interests when: (1) throughout negotiations, the parties modified or attempted to modify the Agreement's settled terms (including the ultimate purchase price), and (2) the Agreement itself contemplated the possibility that the deal might never close. Specifically, provision 5 of the Agreement states that "[i]n the event the transaction does not close, all such material, documents and other information will be returned to KDL and WBI." We think the parties merely intended the Agreement to reflect the current status of their negotiations and to bind each to negotiate with "best efforts" for a specified period. Moreover, the Agreement was obviously intended to placate the Wrights' creditor, thus forestalling foreclosure by continued negotiations.
Simply stated, we view the Agreement as lacking the necessary definiteness of an enforceable contract requiring consummation of the proposed transaction and as lacking the requisite intent of the parties to be bound to same. We construe it as merely an attempt to bind the parties to good faith negotiations. We note that some jurisdictions recognize such agreements to negotiate in good faith and have imposed a measure of damages for a party's failure to so negotiate. See Evans, Inc. v. Tiffany & Company, 416 F.Supp. 224 (N.D.Ill.1976), and Teachers Insurance and Annuity Association of America v. Tribune Company, 670. F.Supp. 491 (S.D. N.Y.1987). We seem to take the traditional "all or nothing" approach:[3] Either the agreement is enforceable as a binding contract to consummate the transaction or it is unenforceable as something less. See Stevens v. Stevens, Ky., 798 S.W.2d 136 (1990); Simpson, 677 S.W.2d 305; Walker, 382 S.W.2d 198; and Johnson v. Lowery, Ky., 270 S.W.2d 943 (1954). We, thus, are compelled to hold the Agreement unenforceable.
In sum, we are of the opinion that the Agreement is indefinite and, thus, cannot constitute an enforceable contract to sell the majority interests of KDL and WBI. We view it as simply an agreement to negotiate in good faith and, as such, without legal import. Hence, we believe the Wrights were entitled to a judgment upon their motion for directed verdict.
We deem the Wrights' remaining arguments moot.

APPEAL NO.1997-CA-001578-MR
For the reasons enunciated above, we are of the opinion that Cinelli was entitled to judgment.
We shall not address Cinelli's remaining issues as we consider them moot.
For the foregoing reasons, the judgment of the Fayette Circuit Court is reversed on both appeals.
*479 ALL CONCUR.

APPENDIX

*480 
*481 
*482 
NOTES
[1] See Appendix.
[2] It appears that during the course of negotiations, the original loan amount of $2.65 million was reduced.
[3] Harvey L. Temkin, When Does the `Fat Lady' Sing? [. . .]: An Analysis `Agreements in Principle' in Corporate Acquisitions, 55 Fordham L.Rev. 125 (1986), contains an analysis and discussion of the "all or nothing" approach.