**BURBACH BROADCASTING COMPANY OF DELAWARE,**
Plaintiff–Appellant,

v.

**ELKINS RADIO CORPORATION; Cat Radio Incorporated, Defendants–Appellees.**

No. 00–2366.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 2, 2001.

Decided Jan. 25, 2002.

**ARGUED:** Joseph W. Conway, Sarver, Pennsylvania, for Plaintiff–Appellant. Jeffrey Stewart Zurbuch, Busch & Talbott, L.C., Elkins, West Virginia, for Defendants–Appellees. **ON BRIEF:** John E. Busch, Busch & Talbott, L.C., Elkins, West Virginia, for Defendants–Appellees.

Before MICHAEL, KING, and GREGORY, Circuit Judges.

Vacated and remanded by published opinion. Judge GREGORY wrote the opinion, in which Judge MICHAEL and Judge KING joined.

## OPINION

GREGORY, Circuit Judge.

Burbach Broadcasting brought suit against Elkins Radio for breach of contract and specific performance based on an alleged agreement made between the parties for the purchase of Elkins' radio station assets. The agreement Burbach sought to enforce took the form of a letter of intent, signed by the parties on October 2, 1998. The district court granted judgment on the pleadings, finding that the letter of intent was not binding because it was subject at all times to the negotiation and execution of a mutually agreeable asset purchase agreement, and no such agreement was ever reached by the parties. Burbach contends that the letter of intent contained all the elements of a complete, binding and enforceable contract and that the lack of an asset purchase agreement does not affect Elkins' obligation to sell the assets. It argues that it could waive the provision calling for an asset purchase agreement because the sole purpose of that provision was to protect itself, due to limited information provided by Elkins. In the alternative, Burbach contends that the letter of intent was, at a minimum, a binding agreement obligating the parties to negotiate in good faith towards a final contract. We find that the complaint adequately states a claim on which relief can be granted, and because the parties' intent to be bound cannot be discerned on the face of the pleadings alone, we vacate and remand to the district court for further proceedings.

I.

In September of 1998, Elkins Radio, through its agent, submitted a written offering document to Burbach Broadcasting regarding the sale of Elkins' radio station assets in West Virginia. In the offering, Elkins proposed to sell the station assets for "$3.6 million on terms." The offering stated that Elkins sought the sale due to retirement of its owner.

After numerous discussions and meetings, the parties signed what was termed a "Letter of Intent" on October 2, 1998. The five page letter was written on Burbach letterhead. Burbach's president, Nicholas Galli, authorized the letter, which was addressed to Richard McGraw, president of Elkins Radio. It was faxed to Richard McGraw at approximately 4:30 p.m. on October 2, 1998, and if Mr. McGraw had not signed it by 5:00 p.m. that same day, it would have become null and void.

The opening paragraph of the letter set forth the assets to be sold by Elkins to Burbach. Following the opening paragraph, the letter stated that because it was "based on certain limited information provided by the Sellers to Buyers," it was subject at all times to 1) buyers' due diligence review of the assets, 2) completion of disclosure schedules for matters related to the assets, 3) "negotiation and execution of a mutually agreeable asset purchase agreement," and 4) FCC approval for the assignment of the stations' licenses from sellers to buyers.

Next, the letter stated, "Sellers and Buyers, intending to be legally bound, hereby agree to the contemplated transaction based on the following terms and conditions." The terms and conditions that followed were set forth with detail.

To begin, the letter called for a purchase price of $1.5 million cash at closing and a $1 million promissory note, which would bear interest and amortize for a term of fifteen years. The letter stated that interest would accrue at the "Prime Rate of National City Bank of Pennsylvania as such may change from time to time plus one half percent." There was to be an interest rate floor throughout the term and an interest rate ceiling of 9.5% for the first five years, 10% for years six through ten, and 10.5% for years eleven through fifteen.

Repayment was to be interest only for the first three years, level amortization of principal over 144 months equal to $6,944.44, plus accrued interest monthly for years four through twelve. Under the letter, buyers had the right to prepay at any time. Though the letter set forth these details regarding interest and repayment, it did not specify whether the promissory note would be secured or unsecured.

The letter called for a consulting contract to Elkins' president, Richard McGraw, for one year after closing, at $3000 a month. Additionally, Mr. McGraw was to sign a three year non-competition covenant. The letter also stated that Elkins was not conveying ownership in its studio facility. Rather, Elkins was to lease Burbach its facilities for two years, at $1000 a month rental, and was to grant three one year renewals after the expiration of the two year term. Other terms specified that the parties would mutually agree to any public announcements, and the date of closing was to be held on the latter of January 4, 1999, or ten business days after Commission approval of the FCC license transfer.

Regarding escrow, the letter stated that Burbach would place $5000 in a closing account held by its FCC counsel within five business days of execution of the letter of intent and $70,000 upon execution of the asset purchase agreement. Funds in escrow would be applied to the purchase price at closing. If Burbach's material breach caused closing to fail, the letter specified that the funds in escrow would be paid to Elkins, as liquidated damages and as Elkins' exclusive remedy for such breach. The escrow funds were to be paid to Burbach if closing failed due to a material breach by Elkins. In addition, the letter stated that "Buyers shall retain the right at Buyer's [sic] option to proceed with an action for specific performance."

The asset purchase agreement to be negotiated by the parties was to 1) provide for, among other things, Burbach's post closing obligations related to operations which were incurred in the ordinary course of business and 2) reflect terms and conditions typical for the sale and purchase of comparable radio broadcasting operations. Under the letter, Burbach had the responsibility of drafting the asset purchase agreement, subject to review by Elkins and Elkins' counsel.

One of the last paragraphs in the letter stated: "Upon execution by the parties herein and subject at all times to the terms herein, this Letter of Intent shall be binding on and enforceable by the parties hereto." The letter of intent was to expire by its own terms if an asset purchase agreement was not executed by 5:00 p.m. on October 22, 1998, provided that a party was not in material breach or had not unreasonably caused a delay.

On October 10, 1998, Elkins' president wrote his broker about the status of Elkins' outstanding debt at that time, which amounted to approximately $1.8 million. The letter was attached to Burbach's complaint. The debt included the broker's possible five percent commission on $2.5 million. Given the $1.8 million in combined debt and commission, Mr. McGraw observed that at least that amount would be needed at closing, instead of the $1.5 million stated in the letter of intent. Mr. McGraw indicated that the debt was higher than he had previously calculated: "I just blew it by forgetting to add in that second part of the CNB loan."

Burbach asserts that Elkins committed a material breach of the letter of intent by demanding an additional $300,000 or $400,000 be added to the cash paid at closing. Burbach argues that this breach made it factually and legally impossible for it to complete a due diligence review of the assets and to negotiate and execute a mutually agreeable asset purchase agreement.

Burbach filed its complaint against Elkins on November 23, 1998, alleging breach of contract based on the letter of intent. Jurisdiction was based on diversity of citizenship-Burbach is a Delaware corporation with its principal place of business in Pennsylvania, and Elkins is a West Virginia corporation with its principal place of business in West Virginia. The letter of intent and other exhibits were attached to the complaint as exhibits. In its responsive pleading, Elkins asserted that Burbach failed to state a claim upon which relief can be granted, and moved to dismiss the complaint. After unsuccessful attempts at mediation, the district court granted Elkins' motion to dismiss, or in the alternative, judgment on the pleadings. The court dismissed the complaint with prejudice, concluding that the letter of intent was not enforceable as a purchase agreement and that it expired by its own terms when the parties failed to negotiate and execute a mutually agreeable asset purchase agreement. Burbach appeals the decision granting judgment on the pleadings.

## II.

The district court granted Elkins' motion to dismiss for failure to state a claim, or in the alternative, judgment on the pleadings. Rule 12(h)(2) provides that the defense of failure to state a claim upon which relief can be granted as set forth in Rule 12(b)(6) may be raised by motion for judgment on the pleadings. Because Elkins' answer had been filed, the pleadings were closed at the time of the motion. Thus, we construe the motion as one for judgment on the pleadings. However, the distinction is one without a difference, as we review the district court's decision to

grant judgment on the pleadings *de novo*, applying the same standard for Rule 12(c) motions as for motions made pursuant to Rule 12(b)(6). *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir.1999); *Pacific Ins. Co. v. American Nat'l Fire Ins. Co.*, 148 F.3d 396, 405 (4th Cir.1998). Accordingly, we assume the facts alleged in the complaint are true and draw all reasonable factual inferences in Burbach's favor. *Edwards*, 178 F.3d at 243.

### III.

The contested issue in this case involves the nature of the obligations, if any, that arose out of the letter of intent signed by the parties on October 2, 1998. The district court found that the letter of intent was not an enforceable contract. Burbach contends 1) the letter contained all of the essential terms necessary for a completed contract, and as such was binding on the parties, and 2) in the alternative, assuming the letter was not a completed contract, it was at a minimum a binding agreement to negotiate in good faith towards a final contract.

Burbach cannot prevail on either theory if the parties did not intend to be bound by the letter of intent. It is fundamental to contract law that mere participation in negotiations does not create a binding obligation, even if agreement is reached on all terms. More is needed than agreement on each detail-the parties must have intended to enter into a binding agreement. The district court ruled, on Elkins' motion for judgment on the pleadings, that the letter was not intended to be binding on the parties. We find, due to ambiguous language in the letter, that intent cannot be discerned on the face of this letter of intent. When intent is not clear from the face of a document, whether parties negotiating a contract intended to be bound by a writing or whether they did

not intend to be bound until a formal agreement was prepared and signed by them must be determined from the facts and circumstances in each case. For this reason, and because the district court considered some matters outside the pleadings, we remand to the district court for determination, based on a full record, of whether the letter falls into one of the two types of preliminary agreements that can be binding on the parties.

Letters of intent have led to much misunderstanding, litigation, and commercial chaos. 1 Corbin on Contracts § 1.16 (1993). Courts have expressed reservation concerning the binding nature of "letters of intent" because traditionally, the purpose and function of a preliminary letter of intent has been to merely provide the initial framework from which the parties might later negotiate a final binding agreement. *See A/S Apothekernes Laboratorium v. I.M.C. Chemical Group, Inc.*, 873 F.2d 155, 158 (7th Cir.1989). Calling a document a "letter of intent" implies, *unless circumstances suggest otherwise*, that the parties intended it to be a nonbinding expression in contemplation of a future contract. As is commonly the case with contract disputes, prime significance attaches to the intentions of the parties and to their manifestations of intent. *Teachers Insurance and Annuity Assoc. of America v. Tribune Co.*, 670 F.Supp. 491, 497 (S.D.N.Y.1987). Labels such as "letter of intent" or "commitment letter" are not necessarily controlling, although they may be helpful indicators of the parties' intentions. *Id.*

Indeed, it is difficult to generalize about the legal effect of preliminary agreements. They can cover a broad scope of agreements, ranging in "innumerable forms and variations" from letters of intent which presuppose that no binding obligations will be placed upon the parties until final con-

tract documents have been signed, to firm binding commitments which, notwithstanding a need for more detailed documentation of agreement, can bind the parties to adhere in good faith to the deal that has been agreed. *Teachers*, 670 F.Supp. at 497.

■ Some preliminary agreements are simply not capable of creating binding obligations. When terms are so vague and indefinite that there is no basis or standard for deciding whether the agreement has been kept or broken, or to fashion a remedy, and no means by which such terms may be made certain, then there is no enforceable contract. *See Ridgeway Coal Co. v. FMC Corp.*, 616 F.Supp. 404, 406 (S.D.W.Va.1985). In preliminary negotiations, when not even the *basic* terms have been agreed upon, courts will not find enforceable binding contracts. This type of unspecific agreement to agree at some time in the future is nothing more than a part of the negotiation process itself.

■ While bare-boned "agreements to agree" are not binding, courts have recognized two kinds of preliminary agreements that are binding and enforceable. Judge Leval, in his well-reasoned and often cited decision, *Teachers Insurance and Annuity Assoc. of America v. Tribune Co.*, 670 F.Supp. 491 (S.D.N.Y.1987), recognized the importance of enforcing and preserving agreements that were intended as binding, despite a need for further documentation or further negotiation. *Id.* at 498. A Type I agreement, the "fully binding pre-

liminary agreement," occurs when parties have reached a complete agreement (including the agreement to be bound) on all issues perceived to require negotiation. *Id.* Such an agreement is preliminary only in form-only in the sense that the parties desire a more elaborate formalization of the agreement. *Id.* "The second stage is not necessary; it is merely considered desirable." *Id.*

■ Judge Leval referred to the second type of binding preliminary agreement as a "binding preliminary commitment." *Id.* The binding obligations attached to a Type II preliminary agreement are different from those that arise out of the first type of agreement. Type I agreements bind parties to their ultimate contractual objective in recognition that a contract was reached, despite the anticipation of further formalities. *Id.* Type II agreements do not commit the parties to their ultimate contractual objective. Rather, they commit the parties to negotiate the open issues in good faith in an attempt to reach the contractual objective within the agreed framework.[1] *Id.* Under this duty to negotiate in good faith, a party is barred from renouncing the deal, abandoning the negotiations, or insisting on conditions that do not conform to the preliminary agreement.[2] *Id.*

### A.

■ Type I fully binding preliminary agreements are not unlike oral agreements

---

1. If a Type I preliminary agreement is reached, a party may demand performance of the transaction even if no further steps have been taken after the preliminary agreement. For Type II agreements, a party may not demand performance. However, that party may demand that his counter-party negotiate the open terms in good faith toward a final contract incorporating the agreed terms. *Teachers*, 670 F.Supp. at 498.

2. This obligation does not guarantee that the final contract will be concluded if both parties comport with their obligation, because good faith differences in the negotiation of the open issues may prevent the parties from reaching a final contract. It is also possible that the parties will lose interest due to changed circumstances and will mutually abandon the negotiation. *Teachers*, 670 F.Supp. at 498.

that are meant to be formalized at a later date.[3] West Virginia law recognizes that where the parties have fully agreed upon all of the matters about which they are negotiating, and have fixed their reciprocal obligations and rights so that the same cannot thereafter be changed without mutual consent, there is a valid and binding contract, notwithstanding the parties may agree that these agreements and understandings shall be subsequently reduced to writing and signed by the parties. *Brown v. Western Maryland Ry. Co.*, 92 W.Va. 111, 114 S.E. 457, 460 (W.Va.1922).

■ The Second Circuit has provided a useful framework to aid courts in determining whether a preliminary agreement is a Type I fully binding preliminary agreement. Among the circumstances which may be helpful in determining whether this type of agreement has been made are 1) whether there has been an express reservation of the right not to be bound in the absence of a writing, 2) whether there has been partial performance of the contract, 3) whether all of the terms of the alleged contract have been agreed upon, and 4) whether the agreement at issue is the type of contract that is usually committed to writing. *Adjustrite Systems, Inc. v. GAB Business Services, Inc.*, 145 F.3d 543, 549 (2d Cir.1998); *see also* Restatement (Second) of Contracts § 27 cmt. c (1981).

### B.

■ Judge Leval modified the test for Type I agreements slightly when he formulated his well known five-part test for determining whether parties intended to form a Type II binding preliminary agreement. The five factors set forth by Judge Leval are 1) the language of the agreement, 2) the existence of open terms, 3) whether there has been partial performance, 4) the context of negotiations, and 5) the custom of such transactions. *Teachers*, 670 F.Supp. at 499–503. The first factor, the language of the agreement, is arguably the most important factor in a court's analysis. However, when the language of an alleged agreement is susceptible to more than one interpretation, as here, a court should focus on the other four factors, which necessarily involves a review of the facts and circumstances surrounding the agreement.[4]

The district court, in relying on the five *Teachers* factors, without specifically stating so, impliedly rejected Burbach's contention that the letter of intent represented a completed contract that was to be formalized at a later time. In other words, the district court determined that the letter of intent was not a Type I fully binding preliminary agreement.[5]

■ West Virginia law is silent as to whether it recognizes the second type of

**3.** Parties who plan to make a final written instrument as the expression of their contract necessarily discuss the proposed terms of the contract before they enter into it and often, before the final writing is made, agree upon all the terms which they plan to incorporate therein. This they may do orally or by exchange of several writings. It is possible thus to make a contract the terms of which include an obligation to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they

have concluded the contract. Restatement (Second) of Contracts § 27 cmt. a (1981).

**4.** In many instances, disputed issues of material fact will preclude summary judgment in favor of either party on this issue. *See generally Arnold Palmer Golf Co. v. Fuqua Industries, Inc.*, 541 F.2d 584, 588 (6th Cir.1976).

**5.** We make no determination on whether the letter of intent did or did not constitute a Type I fully binding preliminary agreement, but leave it to the district court on remand to consider the matter on the facts in the record.

binding agreement, but following the modern trend in contract law, and many state courts that have recognized the pragmatism and commercial necessity of recognizing such agreements, we suspect that it would.[6] We note that West Virginia recognizes that "in every contract there exists an implied covenant of good faith and fair dealing." *Harless v. First National Bank in Fairmont,* 162 W.Va. 116, 246 S.E.2d 270, 274 (W.Va.1978). Furthermore, in *Ridgeway,* supra, the district court for the Southern District of West Virginia, in a contract dispute first filed in West Virginia Circuit Court, recognized that an agreement with terms left open can be binding on the parties if they "have agreed to basic terms, leaving only nonessential elements subject to negotiations." *Id.* This is precisely what Burbach argues on appeal-that with the letter of intent, Elkins, at a minimum, agreed to negotiate in good faith towards filling in the open terms, i.e., towards a mutually acceptable asset purchase agreement. The district court wisely recognized the usefulness of the five *Teachers* factors in determining the parties' intent to be bound, but because this determination necessarily involves matters outside the pleadings, such as the custom of such transactions, the district court should consider the *Teachers* factors on summary judgment, if such a motion is filed.[7] A trial on the merits may be warranted if disputed issues of fact remain. We decline to make an immediate determination of the issue because the record we have before us does not clearly indicate whether summary judgment should be granted or denied.

## IV.

For the foregoing reasons, the judgment of the district court is vacated and remanded for further proceedings.

*VACATED AND REMANDED*

---

**6.** A Type II preliminary agreement prevents parties from arbitrarily abandoning negotiations, and therefore provides an assurance that a deal will falter only over a genuine disagreement and not due to a dispute over the "major" terms of the agreement, which have already been agreed to by the parties.

Without such an agreement, parties may spend enormous sums negotiating every detail of contract wording without knowing whether they have an agreement, and if so, on what terms. *Teachers,* 670 F.Supp. at 499. Because contract law aims to "gratify, not defeat expectations," the modern trend sees courts enforcing agreements that were intended to be binding, even if some terms were left open for further negotiation. *Id.* at 498.

**7.** On remand, we encourage the district court to ensure that West Virginia recognizes Type II agreements and does not follow Kentucky's "all or nothing" approach. Though many jurisdictions recognize agreements to negotiate in good faith and have ordered specific performance or imposed a measure of damages for a party's failure to so negotiate, Kentucky takes the traditional approach-either the agreement is enforceable as a binding contract to consummate the transaction or it is unenforceable as something less. *Cinelli v. Ward,* 997 S.W.2d 474, 478 (Ky.1999).