NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0402n.06
Filed: May 16, 2005

No. 04-5339

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

GIVERNY GARDENS, LIMITED )
PARTNERSHIP, a Kentucky Limited Partnership; )
PARKSIDE G.P. II, INC., a Kentucky )
Corporation; and PARKSIDE USA, LLC, a )
Kentucky Limited Liability Corporation, )
                                      )

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE WESTERN
DISTRICT OF KENTUCKY

       Plaintiffs-Appellants, )

v. )

                                        )

**O P I N I O N**

COLUMBIA HOUSING PARTNERS LIMITED )
PARTNERSHIP, an Oregon Limited Partnership; )
COLUMBIA PORTFOLIO SERVICES, INC., an )
Oregon Corporation; PNC FINANCIAL )
SERVICES GROUP, INC., a Pennsylvania )
Corporation; PNC BANK, NATIONAL )
ASSOCIATION; and COLUMBIA PORTFOLIO )
SERVICES GP, INC., )
                                        )

       Defendants-Appellees. )
                                        )

BEFORE:    COLE and GIBBONS, Circuit Judges, and SCHWARZER, Senior District Judge[*]

    **R. GUY COLE, JR., Circuit Judge.**  This is a diversity contract case under Kentucky law.

Plaintiffs-Appellants Giverny Gardens Limited Partnership, Parkside G.P. II, Inc., and Parkside USA

LLC (collectively, "Parkside"), bring suit against Defendants-Appellees Columbia Housing Partners

---

[*]The Honorable William W Schwarzer, Senior United States District Judge of the Northern District of California, sitting by designation.

Limited Partnership, Columbia Portfolio Services, Inc., PNC Financial Services Group, Inc., PNC Bank, National Association, and Columbia Portfolio Services GP, Inc. (collectively, "Columbia"), for breach of an agreement to develop low-income housing in Kentucky. In particular, Parkside sues Columbia for: (1) breach of a letter of intent; (2) breach of the duty of good faith and fair dealing; and (3) breach of fiduciary duty. The district court granted summary judgment for Columbia and dismissed the complaint. For the following reasons, we **AFFIRM** the judgment of the district court in all respects.

**I.**

The Parkside companies are affiliated entities in the business of developing low-income housing. In the mid-1990s, Parkside organized the Giverny Gardens Limited Partnership for the purpose of developing property in Paris, Kentucky (the "Project"). Since the Project was for low-income housing, Parkside was eligible to receive low-income housing tax credits as a federal subsidy from the Kentucky Housing Corporation ("KHC"), a public corporation of the Commonwealth of Kentucky that administers programs for the creation of low and moderate income housing. Parkside intended to finance the Project by transferring the tax credits to other equity investors.

Parkside has made at least two prior attempts to develop this Project, both of which failed. In 1999, Parkside approached Columbia in an attempt to save the Project. Parkside and Columbia had been partners in three prior real estate development projects involving the receipt and transfer of tax credits. On June 15, 1999, Parkside and Columbia entered into a letter of intent which "outlines certain terms and conditions that will be the basis of the Partnership agreement . . . ."

Based on the letter of intent, the development costs of the project were "expected to be $2,214,122.00." Mortgage financing was to be "provided by Citizens Union Bank in the amount of $1,135,000 with a 8.50% interest rate." The letter of intent also required a due diligence period of 60 days after the receipt of certain documents, during which Columbia "will conduct a due diligence review and negotiate with the General Partner, in good faith, any open terms of this letter of intent." After the completion of the due diligence review, Columbia would submit the transaction to Columbia's Acquisition Review Committee, which "will approve, approve with conditions, or decline the investment based upon its terms and structure."

After the execution of the letter of intent, Parkside then sought an extension of the tax credits, which would expire at the end of 1999. Beginning in June 1999, Parkside also requested that Columbia begin requesting and reviewing documents for the due diligence review. Though Columbia performed some due diligence at this time, a significant number of documents were not requested or reviewed. According to Columbia, the full due diligence would not be performed until the extension of tax credits, which were the financial basis of the deal. According to Parkside, Columbia failed to perform adequately the due diligence since the underwriter assigned by Columbia was inexperienced. Nonetheless, some correspondence between Columbia and Parkside indicated that approval for the Project appeared to be on track prior to the formal extension of tax credits by KHC.

On October 4, 1999, KHC extended the tax credits for an additional two years "provided that Parkside USA has submitted to KHC proof that the construction has started on the project, a new project completion schedule and a copy of the closed loan documents." After receipt of notification

of the extension of tax credits, Columbia and Parkside then attempted to complete the due diligence review. During the review it was determined that the approved mortgage loan amount for the Project was $1,077,500, and not the $1,135,000 to which the parties had agreed. The review also determined that loan fees were approximately $30,000 more than anticipated. On November 22, 1999, Columbia elected not to pursue the Project given these changes.

Parkside brought a suit in state court against Columbia for breach of contract, breach of the duty of good faith and fair dealing, and breach of fiduciary duty. The case was removed to federal district court based on diversity of citizenship. Columbia moved for summary judgment, which was granted by the district court. In particular, the district court held that under *Cinelli v. Ward*, 997 S.W.2d 474 (Ky. Ct. App. 1998), preliminary agreements like the one executed in this case are unenforceable under Kentucky law.

This timely appeal ensued.

## II.

### A. Standard of Review

We review *de novo* a district court's grant of summary judgment. *Tate v. Boeing Helicopters*, 140 F.3d 654, 657 (6th Cir. 1998). Viewing the evidence in the light most favorable to the non-moving party, we must determine whether there is no genuine issue of material fact such that judgment as a matter of law is appropriate. *Id.* As this is a diversity suit, Kentucky law applies. *Gahafer v. Ford Motor Co.*, 328 F.3d 859, 861 (6th Cir. 2003).

### B. Breach of Contract

*1. The Modern Trend and the Kentucky Rule*

Parkside argues that the letter of intent establishes an enforceable contract. Parkside notes the letter of intent is a comprehensive, nine-page, single-spaced document that was written by Columbia and edited by Parkside. In particular, Parkside argues that the letter of intent requires Columbia: (1) to conduct due diligence; (2) to negotiate open terms in good faith; and (3) to submit the Project to Columbia's Acquisition Review Committee. Parkside notes that Randy Deaton, a Columbia employee, testified that the purpose of the letter of intent was to "have some sort of agreement to . . . hold the developer on the project." Deaton further testified that Columbia was "obligated" to perform the "terms and conditions" of the letter of intent.

Parkside further argues that the transaction is best understood as having two distinct phases: "(1) the preliminary stage where Columbia was to evaluate, within the confines of certain defined parameters, whether to make an investment; and (2) the consummation stage where Columbia actually executed the necessary documents to become an investor." The letter of intent, Parkside argues, was the agreement which set out the duties and responsibilities of the parties as to the first stage.

Parkside notes that under the oft-cited *Teachers Insurance & Annuity Association of America v. Tribune Company*, 670 F. Supp. 491 (S.D.N.Y. 1987) ("*TIAA*"), letters of intent or other preliminary agreements between sophisticated business entities are enforceable contracts. In that case, the district court explained that preliminary agreements should be enforceable:

> [One kind] of preliminary binding agreement is one that expresses mutual commitment to a contract on agreed major terms, while recognizing the existence of open terms that remain to be negotiated. Although the existence of open terms generally suggests that binding agreement has not been reached, that is not necessarily so. For the parties can bind themselves to a concededly incomplete

> agreement in the sense that they accept a mutual commitment to negotiate together in good faith in an effort to reach final agreement within the scope that has been settled in the preliminary agreement.

*Id.* at 498. The court then noted several factors which help determine whether a preliminary agreement is binding: (1) the language of the agreement; (2) the existence of open terms; (3) the context of negotiations; (4) whether there was partial performance; and (5) the custom of such transactions. *Id.* at 499-503. Given these principles, the district court held that an institutional lender could sue a prospective borrower for abandoning negotiations, renouncing the deal, or demanding terms outside the scope of the preliminary agreement, and found for the plaintiff on summary judgment. *See id.* at 496, 508. *TIAA* is sometimes referred to as exemplifying the "modern trend" for preliminary agreements. *See, e.g., Burbach Broad. Co. v. Elkins Radio Corp.*, 278 F.3d 401, 409 n.6 (4th Cir. 2002).

The "modern trend" of *TIAA* is contrasted with the "Kentucky rule," which is the traditional "all or nothing" approach to preliminary agreements. *See id.* at 409 n. 7; *Beazer Homes Corp. v. VMIF/Anden Southbridge Venture, LPI*, 235 F. Supp. 2d 485, 491 (E.D. Va. 2002). The lead case for the Kentucky rule is *Cinelli v. Ward*, 997 S.W.2d 474 (Ky. Ct. App. 1998). In that case, a telecommunications company entered into a preliminary agreement with a buyer, who agreed to lend the company $2.65 million in exchange for 54% of the stock. *Id.* at 476. The agreement left open various terms, such as the completion of due diligence and obtaining necessary authorizations for the transfer. *Id.* at 482, ¶ 8(a)-(b) (agreement attached). However, the agreement explicitly stated that "The parties acknowledge and agree that this Agreement is a valid and binding agreement, enforceable against each of them in accordance with its terms." *Id.* at 481, ¶ 8 (agreement attached).

The Kentucky Court of Appeals held the contract unenforceable under Kentucky law. The Court first noted that the "Agreement essentially contemplated the future sale" of the telecommunications company. *Id.* at 477 (emphasis removed). The Court noted that "[w]here an agreement leaves the resolution of material terms to future negotiations, the agreement is generally unenforceable for indefiniteness unless a standard is supplied from which the court can supplant the open terms should negotiations fail." *Id.* The Court stated:

> It is difficult for us to accept Ward's position that the Agreement was intended to be an iron-clad contract to sell . . . majority interests when: (1) throughout negotiations, the parties modified or attempted to modify the Agreement's settled terms (including the ultimate purchase price), and (2) the Agreement itself contemplated the possibility that the deal might never close.

*Id.* at 478. The Kentucky court specifically noted the enforceability of preliminary agreements in other jurisdictions, citing *TIAA*, and contrasted that approach with the rule in Kentucky.

> Simply stated, we view the Agreement as lacking the necessary definiteness of an enforceable contract requiring consummation of the proposed transaction and as lacking the requisite intent of the parties to be bound to same. We construe it as merely an attempt to bind the parties to good faith negotiations. We note that some jurisdictions recognize such agreements to negotiate in good faith and have imposed a measure of damages for a party's failure to so negotiate. *See Evans, Inc. v. Tiffany & Co.*, 416 F. Supp. 224 (N.D. Ill. 1976), and *[TIAA]*, 670 F. Supp. 491 (S.D.N.Y. 1987). We seem to take the traditional "all or nothing" approach: Either the agreement is enforceable as a binding contract to consummate the transaction or it is unenforceable as something less.

*Id.* Accordingly, the Kentucky Court of Appeals held the preliminary agreement unenforceable. *Id.*

> *2. Diversity and Interpretation of Kentucky Law*

On appeal, Parkside concedes that *Cinelli* is *prima facie* controlling. Parkside argues, however, that other principles of Kentucky law indicate that *Cinelli* is distinguishable or wrongly decided, and that this Court should apply the reasoning of *TIAA*.

As an initial matter, in a diversity case, a "federal court is in effect another court of the forum state, in this case Kentucky, and must therefore apply the substantive law of that state." *Gahafer*, 328 F.3d at 861. "Where a state's highest court has spoken to an issue, we are bound by that decision unless we are convinced that the high court would overrule it if confronted with facts similar to those before us." *Kurczi v. Eli Lilly & Co.*, 113 F.3d 1426, 1429 (6th Cir. 1997). "Where a state appellate court has resolved an issue to which the high court has not spoken, we will normally treat [those] decisions . . . as authoritative absent a strong showing that the state's highest court would decide the issue differently." *Managed Health Care Assocs., Inc. v. Kethan*, 209 F.3d 923, 928 (6th Cir. 2000) (citing *Kurczi*, 113 F.3d at 1429)). While "we may refuse to follow intermediate appellate court decisions where we are persuaded that they fail to reflect state law correctly . . . we should not reject a state rule just because it was not announced by the highest court of the state, even if we believe the rule is unsound." *Kurczi*, 113 F.3d at 1429 (internal quotes omitted). Since no Kentucky Supreme Court case has ruled on the issue of preliminary agreements between sophisticated business entities, *Cinelli* is the authoritative Kentucky law on the subject. *See, e.g., Poundstone v. DEW Res.*, 75 Fed. Appx. 353, 364 (6th Cir. 2003) (citing *Cinelli* as controlling on Kentucky law); *Burbach Broad. Co.*, 278 F.3d at 409 n.6 (same); *Beazer Homes Corp.*, 235 F. Supp. 2d at 491 (same).

Parkside argues that *Cinelli* conflicts with two other Kentucky Supreme Court cases, and therefore cannot be binding on a federal court. The first is *Stevens v. Stevens*, 798 S.W.2d 136 (Ky. 1990), which concerns the enforceability of the following clause in a divorce property settlement agreement:

> (3) DAUGHTER'S COLLEGE EDUCATION. HUSBAND hereby declares his intention to provide and pay for a four-year undergraduate college education for Elizabeth, including tuition, books, room, board, and proper related expenses; however, the amount and nature thereof shall hereafter be mutually agreed upon by HUSBAND and Elizabeth.

*Id.* at 137 (emphasis removed). The Kentucky Supreme Court noted that as a general matter, agreements to agree are unenforceable, absent "such an exceptional character as to justify an exercise of the court's powers of equity." *Id.* at 139. That Court then held that since "the respondent's intent to provide his daughter with a four-year undergraduate education is clear, equity demands that the respondent be required to pay some amount." *Id.*

The second case is *Simpson v. JOC Coal, Inc.*, 677 S.W.2d 305 (Ky. 1984), which dealt with the purchase of stock from the majority shareholders of a coal company. A minority shareholder was not a party to this purchase agreement, but was referenced by the following clause:

> [T]he parties to this agreement acknowledge that two Shareholders . . . are not parties to this agreement. It is, however, understood that the JOC Companies will undertake to conclude a similar arrangement with [the minority shareholder] under which said . . . will also consent to a similar ammending [sic] of the Agreement.

*Id.* at 306-07. The Kentucky Supreme Court held that the clause was not an unenforceable agreement to agree, since "the trial court could determine value from a contemporaneous, bona fide

sale." *Id.* at 309. Accordingly, the clause was properly enforceable, and the minority shareholder had an enforceable right to performance. *Id.*

Both *Stevens* and *Simpson* are inapplicable here. As an initial matter, neither case concerns a preliminary agreement between sophisticated business entities in the process of consummating a complicated business transaction. Rather, both concern the enforceability of arguably open clauses in otherwise enforceable agreements.

Furthermore, *Stevens* does not stand for the general acknowledgment that preliminary agreements or agreements to negotiate in good faith are enforceable under Kentucky law. Rather, *Stevens* is an exercise of equity power by the Kentucky Supreme Court to force a father to abide by a promise he made to his daughter. *Stevens*, 798 S.W.2d at 139. Since Parkside and Columbia are established, sophisticated business entities, *Stevens* is clearly distinguishable.

Nor does *Simpson* contemplate an agreement to negotiate certain terms in good faith. Rather, *Simpson* merely stands for the uncontroversial proposition of contract interpretation that ambiguous terms may be fixed by viewing the context of the agreement. Since the stock price had been previously negotiated and executed, it was simple contract interpretation to determine that the same price should be afforded to the minority shareholder. *Simpson*, 677 S.W.2d at 309.

Indeed, at least one Kentucky Supreme Court case would appear to support *Cinelli*. In *Walker v. Keith*, 382 S.W.2d 198 (Ky. 1964), a lease contained a ten-year renewal option under the same terms and conditions of the lease. The option stated:

> rental will be fixed in such amount as shall actually be agreed upon by the lessors
> and the lessee with the monthly rental fixed on the comparative basis of rental values

>       as of the date of the renewal with rental values at this time reflected by the
>       comparative business conditions of the two periods.

*Id.* at 199. That Court noted that the parties' attempt to fix the future rent based on "comparative business conditions" was insufficient, since it was unclear whether the parties had "in mind local conditions, national conditions, or conditions affecting the lessee's particular business." *Id.* at 203. Accordingly, the Kentucky Supreme Court held this clause unenforceable, since there was no proper quantum to determine what the future rent would be. *Id.* at 200, 205.

*Walker* appears to support the *Cinelli* rule that agreements to bind parties to future negotiations in good faith are unenforceable agreements to agree. Since the "comparative business conditions" at the time of renewal were not specified in *Walker*, the clause would be open to further negotiations between the parties. *Walker*, 382 S.W.2d at 203. Similarly, the structured process of engaging in due diligence and obtaining the necessary regulatory approval for the transfer of a telecommunications company in *Cinelli*, 997 S.W.2d at 478, left much of the deal open to future substantive negotiations.

Given this Kentucky case law, there is no "strong showing" that the Kentucky Court of Appeals misinterpreted Kentucky law in *Cinelli*. *See Managed Health Care Assocs., Inc.*, 209 F.3d at 928 (6th Cir. 2000) ("Where a state appellate court has resolved an issue to which the high court has not spoken, we will normally treat [those] decisions . . . as authoritative absent a strong showing that the state's highest court would decide the issue differently.")

   *3. Application*

Application of *Cinelli* resolves this case in Columbia's favor. First, the preliminary agreements in both cases are complicated and long, detailing numerous terms and conditions of the proposed business arrangment. *See Cinelli*, 997 S.W.2d at 479-82 (appending five-page preliminary agreement); (Columbia Letter of Intent (nine-page letter of intent)). Second, the parties in each of these cases are sophisticated business entities in an arms-length negotiation to consummate a significant business deal. *See Cinelli*, 997 S.W.2d at 476-77 (stock sale of telecommunications companies for $2.65 million); (Columbia Letter of Intent at 1-3 (noting financial terms of deal)). Third, in both cases, the parties left the consummation of the deal dependent on the completion of due diligence and regulatory approval. *See Cinelli*, 997 S.W.2d at 481, ¶ 8(a)-(b); (Columbia Letter of Intent at ¶ 9.A). Fourth, though the parties in both cases apparently intended the preliminary agreements to be binding, the terms of the agreements specifically contemplated the possibility that the deal could fall through. *See Cinelli*, 997 S.W.2d at 482, ¶ 8 (specifically noting that the agreement is "binding," but also noting that the "obligations of Ward shall be conditioned upon" the completion of due diligence and regulatory approval); (Columbia Letter of Intent at ¶ 9.A (noting that Columbia will negotiate in "good faith, any open terms" after the due diligence review, and stating the Acquisition Review Committee may "decline the investment" after the review)).

On this last point, Parkside argues that failure to enforce the letter of intent would frustrate the clear intention that both parties act in good faith in an attempt to consummate the transaction. *See Deerfield Ins. Co. v. Warren County Fiscal Court*, 88 S.W.3d 867, 873 (Ky. Ct. App. 2002) ("The goal of any court in interpreting a contract is to ascertain and to carry out the original intentions of the parties."). This is the primary appeal for the "modern trend" towards enforceability

of comprehensive preliminary agreements executed by sophisticated business entities. *TIAA*, 670 F.Supp. at 498. However, federal courts are bound to apply state law in diversity cases, even if such law is "unsound," *Kurczi*, 113 F.3d at 1429, and federal courts should resist the urge to "modernize" state common law. *Combs v. Int'l Ins. Co.*, 354 F.3d 568, 578 (6th Cir. 2004) ("Federal courts hearing diversity matters should be extremely cautious about adopting substantive innovation in state law.") (quotations omitted) . Here, the traditional Kentucky rule is clear — preliminary agreements such as the letter of intent in this case are unenforceable.

## C.    Duty of Good Faith and Fair Dealing

Under Kentucky law, it is well-established that the implied covenant of good faith and fair dealing arises from an enforceable contract. *See Auto Channel, Inc. v. Speedvision Network LLC*, 144 F. Supp. 2d 784, 791 (W.D. Ky. 2001); *Ranier v. Mt. Sterling Nat'l Bank*, 812 S.W.2d 154, 156 (Ky. 1991). Since this letter of intent is unenforceable under Kentucky law, Parkside cannot assert a claim for a breach of the implied duty.

## D.    Fiduciary Duty

Parkside also claims that Columbia breached a fiduciary duty by not consummating the transaction. Parkside notes that it had cooperated with Columbia on several low-income housing tax credit transactions. Parkside argues that this history of a working relationship establishes a "joint adventure" which can give rise to a fiduciary duty. *See Greenup v. Hewett*, 235 S.W.2d 1000, 1002 (Ky. 1951) ("The relationship between joint adventurers, like that existing between partners, is fiduciary in character, and imposes upon all the participants the obligation of loyalty to the joint

concern and of the utmost good faith, fairness, and honesty in their dealings with each other with respect to matters pertaining to the enterprise.").

Parkside's argument is unpersuasive. Under Kentucky law, a joint adventure is "an informal association of two or more persons, partaking of the nature of a partnership, usually, but not always, limited to a single transaction in which the participants combine their money, efforts, skill, and knowledge for gain, with each sharing in the expenses and profits or losses." *Roethke v. Sanger*, 68 S.W.3d 352, 364 (Ky. 2001). There are four elements necessary for the establishment of a joint adventure:

> (1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control.

*Id.* Here, Parkside and Columbia were not engaged in a joint adventure. As noted above, Kentucky law does not recognize the enforceability of a preliminary agreements such as the letter of intent executed in this case. Nor is there additional evidence that some other enforceable agreement was contemplated by the parties. Accordingly, Parkside and Columbia had no express or implied agreement necessary to support a joint adventure.

Absent a finding of a joint adventure, Parkside cannot show that Columbia had a fiduciary duty. The Kentucky Supreme Court has articulated the following definition of a fiduciary duty:

> [A]s a general rule, we can conclude that such a relationship is one founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking . . . .

> The relation[ship] may exist under a variety of circumstances; it exists in all cases where there has been a special confidence reposed in one who in equity and good conscience is bound to act in good faith and with due regard to the interests of the one reposing confidence.

*Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991) (internal quotes and citations omitted).

Given this definition, Columbia did not owe Parkside a fiduciary duty. Parkside and Columbia are sophisticated business entities who were attempting to consummate a complicated business transaction. The terms of the letter of intent required Columbia to engage in a lengthy period of due diligence to verify the costs, profits, and feasibility of the Project, and determine whether Columbia would make an investment therein. Here, Columbia and Parkside were acting in their own interests in determining whether the Project was viable. Other courts have previously found that such arms-length negotiations preclude a finding of a fiduciary relationship. *Hendrickson v. Peabody Coal Co.*, 37 F. Supp. 2d 947, 954 (W.D. Ky. 1997) (applying Indiana law); *Phoenix Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. P'ship*, 734 F. Supp. 1181, 1192 (D. Md. 1990) ("A fiduciary relationship hardly arises when commercial parties engage in contract negotiations."). Accordingly, Columbia had no fiduciary duty to Parkside.

**E. Dismissal of Affiliated Entities**

Finally, Parkside claims that the district court erred in dismissing Columbia's affiliated and parent entities. However, since Parkside offers no independent allegations against Columbia's affiliated and parent entities, there are no separate claims.

**III.**

For the foregoing reasons, we **AFFIRM** the judgment of the district court in all respects.