Albert CINELLI, Appellant,

v.

Thomas G. WARD, Appellee.

Kentucky Data Link, Inc.; Wright Businesses, Inc.; Arthur Wright; and A.D. Wright, Appellants,

v.

Thomas G. Ward, Appellee.

Nos. 1997–CA–001578–MR, 1997–CA–001579–MR.

Court of Appeals of Kentucky.

Jan. 8, 1998.

Rehearing Denied March 12, 1999.

Discretionary Review
Denied by Supreme Court Aug. 18, 1999.

Keith Moorman, Medrith Lee Hager, Lexington, KY, for Appellant/Cinelli.

John R. Leathers, Stephen G. Allen, Lexington, KY, for Appellants/Kdl, Wright Businesses, et al.

Mark J. MacDougall, Tracy B. McKibben, Washington, D.C., Thomas L. Gabelman, Kevin Matthews, Cincinnati, OH, for Appellee/Ward

Before HUDDLESTON, KNOPF, and MILLER, Judges.

## OPINION

MILLER, Judge.

Albert Cinelli brings Appeal No.1997–CA–001578–MR from a March 27, 1997, judgment of the Fayette Circuit Court entered upon a jury verdict. Kentucky Data Link, Inc., Wright Businesses, Inc., Arthur Wright, and A.D. Wright bring Appeal No.1997–CA–001579–MR from the same judgment. We reverse on both appeals.

The facts are these: Arthur Wright and A.D. Wright (the Wrights) were sole shareholders of two family-owned corporations: Wright Businesses, Inc. (WBI), and Kentucky Data Link, Inc. (KDL). The entities were engaged in the telecommunication business. WBI and KDL were in default on a loan agreement with Communications Credit Corporation. It appears, however, that the Wrights were not exposed to personal liability thereon. The Wrights sought to raise capital to avert the imminent foreclosure of their businesses. In such vein, the Wrights began negotiating with appellee, Thomas G. Ward (Ward), to sell the controlling interests of WBI and KDL. In furtherance thereof, they entered into a "no-shop" agreement, which prevented the Wrights from negotiating with third parties. The no-shop

agreement expired in September 1995. On September 15, 1995, the parties entered into an "Agreement" (the Agreement).[1] The Agreement's legal import is a matter of much contention between the parties and forms the underlying legal basis of the appeals before us.

In its most basic form, the Agreement contemplated that at a future date Ward would "lend" to the Wrights $2.65 million, which would be evidenced by a promissory note.[2] At Ward's option, the promissory note could be converted into stock representing 54% of WBI's and KDL's outstanding shares. Needless to say, the proposed transaction between the parties never took place. It is asserted that negotiations reached an impasse over three basic issues:

(1) whether the Wrights would accept personal responsibility for any breaches [sic] of warranty or representation made by Data Link or Wright Businesses;

(2) whether the Wrights would accept employment provisions which allowed for them to be summarily terminated from the companies they created and developed; and

(3) whether the Wrights would agree to allow Ward to have day-to-day control over Data Link and Wright Businesses (in addition to majority stock control).

In any event, by letter dated January 12, 1996, the Wrights notified Ward that negotiations were terminated. It appears that the Wrights, sometime in November 1995, entered into negotiations with appellee, Albert Cinelli (Cinelli). On January 15, 1996, Cinelli and the Wrights entered into a contract whereby Cinelli acquired 51% of WBI's and KDL's outstanding shares in exchange for $3 million.

On March 1, 1996, Ward filed the instant action against the Wrights for breach of the Agreement, for breach of the implied duty of good faith and fair dealing, and for conspiracy to deprive him of an advanta-geous business relationship. Cinelli was also named as a defendant for tortious interference with existing and prospective contractual relationships. The jury ultimately returned a verdict in favor of Ward in the amount of $987,000.00 against the Wrights and $867,000.00 against Cinelli. These appeals followed.

### *APPEAL NO.1997–CA–001579–MR*

The Wrights contend that the circuit court committed reversible error by not granting them a judgment upon their motion for directed verdict. Ky. R. Civ. P. (CR) 50.01. Specifically, they contend that the Agreement was unenforceable under Kentucky law.

 It is well established that construction and interpretation of a written instrument are questions of law for the court. *See Morganfield National Bank v. Damien Elder & Sons*, Ky., 836 S.W.2d 893 (1992). We review questions of law *de novo* and, thus, without deference to the interpretation afforded by the circuit court. *Cf. Louisville Edible Oil Products, Inc. v. Revenue Cabinet Commonwealth of Kentucky*, Ky.App., 957 S.W.2d 272 (1997). There exists much controversy concerning whether the Agreement was an "agreement to agree" or a binding contract to sell KDL's and WBI's majority interests. The Wrights, of course, contend that the Agreement was merely an agreement to agree, while Ward believes it constitutes a binding contract to sell. Resolution of this appeal revolves around the proper construction of the document.

Provision 1 of the Agreement specifically provides that "[s]ubject to the terms and conditions set forth herein, Ward shall loan to KDL and WBI, on the Closing Date, an aggregate principal amount of $2,650,-000...." In exchange for the "loan," Ward was given the right to acquire 54% of KDL's and WBI's outstanding stock

---

**1.** See Appendix.

**2.** It appears that during the course of negotiations, the original loan amount of $2.65 million was reduced.

shares. It must be emphasized that the sale of the majority interests was to take place at a specific future time designated as the "Closing Date". Provision 2 of the Agreement sets forth the closing date as September 29, 1995, "or such other date ... as the parties shall agree...." Thus, the Agreement essentially contemplated the **future sale** of KDL's and WBI's majority interests.

■ It appears that the futurity of the sale resulted from several terms left "open" or unresolved by the Agreement. These terms were to be addressed in future negotiations between the parties. The open terms included day-to-day control of KDL and WBI, the Wrights' personal liability, and particulars of the Wrights' employment contracts. Moreover, the Agreement contemplated that the parties would enter into three additional agreements, that is, an employment agreement, a shareholders' agreement, and a loan purchase agreement. The Agreement's open terms were never resolved by the parties' negotiations, and the additional agreements were, of course, never consummated. At the outset, we conclude that the Agreement's open terms were material. We view these terms as absolutely necessary to the formation of a binding contract to sell KDL's and WBI's majority interests.

The Wrights assert that the unresolved open terms rendered the Agreement indefinite and unenforceable. In support thereof, they cite *Walker v. Keith*, Ky., 382 S.W.2d 198 (1964), for the following proposition:

"To be enforceable and valid, a contract to enter into a future covenant must specify all material and essential terms and leave nothing to be agreed upon as a result of future negotiations."

*Id.* at 201 (quoting *Johnson v. Lowery*, Ky., 270 S.W.2d 943, 946 (1954)). The *Walker* court concluded that the parties must either agree upon the material terms or supply a "definite method of ascertaining" same. *Id.* at 202. Ward, however, contends that the unresolved open terms of the Agreement do not render it unenforceable. He asserts that these terms can be supplied by the court and directs our attention to *Simpson v. JOC Coal, Inc.*, Ky., 677 S.W.2d 305 (1984). Therein, JOC Coal entered into an agreement with the majority shareholders of a corporation to purchase their stock. In the agreement, JOC Coal also agreed to " 'conclude a similar arrangement with James W. Simpson [the minority shareholder] under which said James W. Simpson will also consent to a similar ammending [sic] of the Agreement.' " *Id.* at 306–307. Simpson filed an action alleging that JOC Coal failed to negotiate in good faith, thus violating the agreement. The Court of Appeals, holding that the agreement's terms were indefinite and uncertain, refused to enforce same. The Supreme Court reversed by holding:

[*Walker v. Keith*] is far different in degree of uncertainty from the present case where the contract obligates JOC Coal Companies to undertake to conclude a similar agreement with James W. Simpson, which is subject to a reasonable interpretation as meaning to make Simpson a similar offer for his shares.... Unlike *Walker*, here the promisor's commitment is sufficiently defined to be enforceable.

*Id.* at 309. As in *Simpson*, Ward contends that the court can simply supply the Agreement's unresolved open terms. We disagree.

■ Where an agreement leaves the resolution of material terms to future negotiations, the agreement is generally unenforceable for indefiniteness unless a standard is supplied from which the court can supplant the open terms should negotiations fail. In *Simpson*, 677 S.W.2d 305, the unresolved material terms were easily determined by reference to the majority shareholders' agreement. Conversely, in *Walker*, 382 S.W.2d 198, there was no similarly agreed-upon "definite method of as-

certaining" such material terms. In the case at hand, the court is not supplied any standard or agreed-upon method with which to supplant the Agreement's unresolved open terms. Absent such standard, any attempt to supply the Agreement's unresolved open terms would be sheer conjecture. We believe the Agreement is essentially too indefinite for the court to view it as an enforceable contract to sell the majority interests in KDL and WBI.

Additionally, we do not believe that the Agreement was intended to constitute a binding contract to buy and to sell the majority interest in KDL and WBI. When construing a contract, it is well established that the court may look to surrounding circumstances and the parties' conduct as a guide. *See Jones v. Linkes*, Ky., 267 S.W.2d 936 (1954); *Dennis v. Watson*, Ky., 264 S.W.2d 858 (1954); and *Thompson v. Fairleigh*, 300 Ky. 144, 187 S.W.2d 812 (1945). It is difficult for us to accept Ward's position that the Agreement was intended to be an iron-clad contract to sell KDL's and WBI's majority interests when: (1) throughout negotiations, the parties modified or attempted to modify the Agreement's settled terms (including the ultimate purchase price), and (2) the Agreement itself contemplated the possibility that the deal might never close. Specifically, provision 5 of the Agreement states that "[i]n the event the transaction does not close, all such material, documents and other information will be returned to KDL and WBI." We think the parties merely intended the Agreement to reflect the current status of their negotiations and to bind each to negotiate with "best efforts" for a specified period. Moreover, the Agreement was obviously intended to placate the Wrights' creditor, thus forestalling foreclosure by continued negotiations.

Simply stated, we view the Agreement as lacking the necessary definiteness of an enforceable contract requiring consummation of the proposed transaction and as lacking the requisite intent of the parties to be bound to same. We construe it as merely an attempt to bind the parties to good faith negotiations. We note that some jurisdictions recognize such agreements to negotiate in good faith and have imposed a measure of damages for a party's failure to so negotiate. *See Evans, Inc. v. Tiffany & Company*, 416 F.Supp. 224 (N.D.Ill.1976), and *Teachers Insurance and Annuity Association of America v. Tribune Company*, 670. F.Supp. 491 (S.D. N.Y.1987). We seem to take the traditional "all or nothing" approach:[3] Either the agreement is enforceable as a binding contract to consummate the transaction or it is unenforceable as something less. *See Stevens v. Stevens*, Ky., 798 S.W.2d 136 (1990); *Simpson*, 677 S.W.2d 305; *Walker*, 382 S.W.2d 198; and *Johnson v. Lowery*, Ky., 270 S.W.2d 943 (1954). We, thus, are compelled to hold the Agreement unenforceable.

In sum, we are of the opinion that the Agreement is indefinite and, thus, cannot constitute an enforceable contract to sell the majority interests of KDL and WBI. We view it as simply an agreement to negotiate in good faith and, as such, without legal import. Hence, we believe the Wrights were entitled to a judgment upon their motion for directed verdict.

We deem the Wrights' remaining arguments moot.

### APPEAL NO.1997–CA–001578–MR

For the reasons enunciated above, we are of the opinion that Cinelli was entitled to judgment.

We shall not address Cinelli's remaining issues as we consider them moot.

For the foregoing reasons, the judgment of the Fayette Circuit Court is reversed on both appeals.

**3.** Harvey L. Temkin, *When Does the 'Fat Lady' Sing? [ … ]: An Analysis 'Agreements in Principle' in Corporate Acquisitions*, 55 Ford- ham L.Rev. 125 (1986), contains an analysis and discussion of the "all or nothing" approach.

ALL CONCUR.

APPENDIX

AGREEMENT

This Agreement is entered into this 15th day of September, 1995 by and among Kentucky Data Link, Inc., a Kentucky corporation ("KDL"), Wright Businesses, Inc., a Kentucky corporation ("WBI"), Arthur Wright, A.D. Wright (collectively, the "Wrights"), individuals residing in the State of Kentucky who are the stockholders of KDL and WBI, and Thomas G. Ward, an individual residing in the state of Kentucky ("Ward").

1. **Loan and Conversion of Note**. Subject to the terms and conditions set forth herein, Ward shall loan to KDL and WBI, on the Closing Date, an aggregate principal amount of $2,650,000 (the "Loan"). The Loan shall be evidenced by a promissory note (the "Note") made by KDL and WBI to Ward. The Note shall be convertible, at the option of the holder, during the ten-day period after issuance, into stock representing 54% of the outstanding shares of each of KDL and WBI.

The proceeds of the Loan shall be used solely to pay down, on the Closing Date, the indebtedness of KDL and WBI to NTFC Capital Corporation ("NTFC").

2. **Closing Date**. The closing of the transactions contemplated hereby shall take place at a location mutually agreeable to the parties on September 29, 1995 or such other date, either earlier or later, as the parties shall agree (the "Closing Date").

3. **Employments Agreements**. On the Closing Date, KDL and WBI shall enter into employment agreements with Arthur Wright and A.D. Wright. Arthur Wright's employment agreement with KDL and WBI shall be for an initial term of 5 years for annual compensation of $65,000 in addition to the use of a car owned by one of his employers. A.D. Wright's employment agreement with KDL and WBI shall be for an initial term of 5 years for annual compensation of $90,000. The employment agreements will provide for reasonable and customary benefits and shall otherwise be in form and substance satisfactory to employers and employees.

In addition, Ward agrees that he will take no action to (a) hire excessive employees or (b) pay a salary to any employee higher than the then current salary being paid to A.D. Wright, so long as A.D. Wright is working as a full-time employee.

4. **Definitive Documentation**. Between the date hereof and the Closing Date, the parties shall use their respective best efforts to enter into such documents as are necessary and appropriate to reflect the rights and obligations of the parties in connection with the consummation of the transactions contemplated hereby. Among other documents, the parties shall enter into a Shareholders' Agreement relating to the stock of each of KDL and WBI (the "Stockholders' Agreements"). The

PLAINTIFF'S EXHIBIT

7

P 000256

Stockholders' Agreements shall contain, among other provisions, typical restrictions on the transfer of stock and the requirement for an affirmative vote of 65% of the outstanding shares of the corporation in question to approve any of the following:

a. incurrence of material debt, except for debt to provide for working capital and capital expenditures in the ordinary course of business of KDL or WBI;

b. the sale of substantially all of the assets or substantially all of the stock of KDL or WBI or a merger or other business combination of KDL or WBI with another business entity;

c. issuance of stock of KDL or WBI;

d. a change in the size of the board of directors or other provisions in the Stockholders' Agreements relating to board composition;

e. the payment of dividends on any capital stock; or

f. liquidation or any other dissolution of KDL or WBI.

The Stockholders' Agreements will specifically allow Ward to transfer 5% of the outstanding stock of each of KDL and WBI to Colleen Milburn and will allow all stockholders to transfer shares to family members and family trusts in connection with estate planning. The Stockholders' Agreements shall also provide for each company to be governed by a board of directors consisting of 5 directors. The shareholders will agree to vote their respective shares to elect to the board 2 nominees of the Wrights and 3 nominees of Ward.

5. Access; Due Diligence. From the date hereof, KDL, WBI, A.D. Wright and Arthur Wright shall give Ward or his representatives or agents access to the premises, business records and employees of KDL and WBI to allow Ward to conduct a due diligence investigation. The due diligence investigation shall be conducted during normal business hours in a manner designed to minimize interference with the day-to-day operations of KDL and WBI. Ward agrees that he, his representatives and agents shall treat in confidence all documents, materials and other information obtained during the due diligence process and that such information will be used for the sole purpose of evaluating this transaction. In the event the transaction does not close, all such material, documents and other information will be returned to KDL or WBI.

6. Conduct of the Business Pending Closing. Between the date hereof and the Closing Date, KDL, WBI, Arthur Wright and A.D. Wright agree that the businesses of KDL and WBI shall be

conducted only in the ordinary course. By way of example and not by way of limitation, KDL, WBI, Arthur Wright and A.D. Wright agree that between the date hereof and the Closing Date, without the written consent of Ward, none of them shall do any of the following:

a. enter into any material contract affecting the businesses or liabilities of KDL or WBI;

b. purchase any capital asset for a purchase price of $5,000 or more or purchase capital assets for an aggregate purchase price of $10,000 or more;

c. enter into any indebtedness for which KDL or WBI has any liability (but without affecting business expenses incurred in the ordinary course);

d. increase the compensation or perquisites of any employee of KDL or WBI;

e. sell or encumber any assets of KDL or WBI except for sales of inventory in the ordinary course of business for KDL or WBI; or

f. issue or transfer any capital stock or any security convertible into capital stock of KDL or WBI.

In addition, neither Arthur Wright nor A.D. Wright shall withdraw any funds from KDL or WBI except funds for the payment of their salaries, with the understanding that Arthur Wright shall be entitled to an annual salary of $65,000 and A.D. Wright shall be entitled to an annual salary of $90,000 beginning on the date hereof.

7. NTFC Payoff; Tax Election. On the Closing Date, the Wrights and Ward shall cause KDL and WBI to pay all indebtedness to NTFC (the "Payoff") using the proceeds of the Loan and such other funds as the parties shall deem to be in the best interest of KDL, WBI and their respective stockholders.

· Immediately after the Payoff, A.D. Wright shall make an appropriate tax election to close the books of KDL for the purpose of creating two taxable years for KDL in 1995, one ending on the Closing Date and the second beginning immediately thereafter.

8. Binding Agreement; Conditions Precedent. The parties acknowledge and agree that this Agreement is a valid and binding agreement, enforceable against each of them in accordance with its terms. Notwithstanding the foregoing, the obligations of Ward shall be conditioned upon the following:

P 000258

a. completion of the due diligence investigation to the satisfaction of Ward, which determination will be made in his sole discretion; and

b. obtaining all necessary approvals and authorizations, including, without limitation, any approvals or authorizations from federal and state regulators of telecommunications.

Notwithstanding the foregoing, Ward agrees to complete his due diligence investigation by September 29, 1995 and to use his best efforts to obtain any necessary approvals by such date.

9. Counterparts; Facsimiles. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. This Agreement may also be delivered by facsimile transmission, and an Agreement executed and transmitted by facsimile shall be deemed an original.

IN WITNESS WHEREOF, and with the intention of being bound by this Agreement, the parties hereto execute this Agreement on the date hereof.

KENTUCKY DATA LINK, INC.

By: _____
Its: President

WRIGHT BUSINESSES, INC.

By: _____
Its: President

_____
Thomas G. Ward

_____
A. D. Wright

_____
Arthur Wright

P 000259