**NOT RECOMMENDED FOR PUBLICATION**
File Name: 12a0685n.06

No. 10-6423

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**

JUNE 28, 2012

LEONARD GREEN, Clerk

ASSOCIATED WAREHOUSING, INC.,

Plaintiff-Appellant,

v.

BANTERRA CORPORATION, d/b/a Banterra Bank,

Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

**ON APPEAL** FROM THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF KENTUCKY

BEFORE:     MERRITT and ROGERS, Circuit Judges; and POLSTER, District Judge.[*]

**I.  Overview**

**MERRITT, Circuit Judge.**  Plaintiff Associated Warehousing, Inc., a Kentucky company, brought contractual claims against an Illinois-based regional banking system, Banterra Corporation, for breach of contract and breach of the covenant of fair dealing, and non-contractual claims for deceit, negligent misrepresentation, and promissory estoppel.  At the root of all of the claims is Banterra's alleged wrongful refusal to obtain a "wrap-around" letter of credit so that Associated Warehousing could secure a bond indenture to replace two short-term building loans.  The district court granted Banterra's motion for summary judgment after concluding that (1) the parties did not enter into a valid contract for a letter of credit and (2) Associated Warehousing's non-contractual

---

[*]The Honorable Dan A. Polster, United States District Court for the Northern District of Ohio, sitting by designation.

claims raised no genuine issues of material fact. This appeal followed. Except for our *de novo* review of the district court's grant of summary judgment in favor of Banterra, which is governed by Federal Rule of Civil Procedure 56(a), Kentucky law controls the case because it is in federal court on the basis of diversity jurisdiction.

## II. Factual Summary

This lawsuit arose out of a financing agreement for a warehouse construction project in Murray, Kentucky, between Associated Warehousing and Banterra. According to the terms of the deal, the parties contemplated that Banterra would agree to provide Associated Warehousing with a real estate term loan, a non-revolving construction loan, and a letter of credit to secure a bond issue that another bank, AmSouth, would underwrite. The bond issue would take place after the two short-term loans as a method of financing those debts on a permanent basis. In February 2002, the parties laid out the components of the agreement in a Terms Letter (First Terms Letter). In April 2002, Banterra's Loan Committee approved both the real estate and construction loans. However, in early June 2002, a problem arose with the third component of the agreement, *i.e.*, the letter of credit. AmSouth informed Associated Warehousing that Banterra was a "non-rated" bank (a bank with a low capital base) and that, for the bond issue to proceed, Banterra would need to support its own letter of credit with a "wrap-around" or supplementary letter of credit from another, rated financial institution.

In July 2002, Banterra sent Associated Warehousing another Terms Letter (Second Terms Letter) that reincorporated the three components of the First Terms Letter and outlined certain proposed terms for the financing package. As to the letter of credit, the Second Terms Letter stated

that Banterra would "[p]rovide a letter of credit to back a Bond Issue" and listed a number of terms material to that transaction (including instructions for repayment, the term of maturity for the loan, and Banterra's fee). But it omitted other significant terms (including a final amount, instructions for how to draw upon the letter of credit, an interest rate, and a closing date) and did not discuss to whom the letter of credit would be endorsed (AmSouth), the fact of Banterra's "non-rated" status, or the need for a rated bank to provide additional credit security.[1] Banterra did, however, close on the short-term real estate and construction loans one week later. Associated Warehousing then

---

[1] With respect to the letter of credit, the Second Terms Letter read in its entirety as follows:

LETTER OF CREDIT:

| | |
|---|---|
| Purpose: | Provide a letter of credit to back a Bond issue for the permanent financing of the above credit facilities (Term Note and Construction Note) |
| Amount: | $1,625,000 (actual amount to be determined) |
| Repayment: | Debt retirement to the bondholders will be interest monthly (through Trustee) for 17 years with $100,000 annual principal payments due the first 16 years and balance ($50,000 +/-) due at the end of the 17th year. Maturity on or about December 15, 2019. |
| Maturity: | 364 days from closing |
| Rate: | To be determined if Letter is drawn |
| Fee: | 1.0% of loan amount |
| Collateral: | (See list for non-revolving draw note above.) |
| Prepayment: | No prepayment penalty |
| Guarantors: | Associated Systems, Inc. Maxie & Phyllis Manning Anthony & Teresa Manning Randy & Vanessa McDaniel |

began constructing the warehouse in Murray, Kentucky. Banterra spent the next several months negotiating with First Tennessee Bank, a rated bank, over the terms for obtaining from it a "wrap-around" letter of credit. These negotiations, although protracted, appeared to be on track. In January 2003, Kevin Peck, the Banterra employee who was handling the deal with Associated Warehousing, signed a letter agreement preliminarily retaining bond counsel to oversee and facilitate the bond transaction with First Tennessee and AmSouth. Peck, however, left his job shortly after signing the letter agreement. His replacement, Jeff May, assumed responsibility for handling the financing arrangement with First Tennessee and AmSouth and ultimately concluded that First Tennessee's terms for issuing the supplementary letter of credit were unacceptable. Apparently, among other new developments, First Tennessee sent Banterra a draft bond redemption agreement that would have required Banterra's Board of Directors to pass a resolution obligating Banterra to redeem the bonds for bondholders in the event of a default. The breakdown in negotiations between Banterra and First Tennessee meant that Associated Warehousing, in July 2003, accepted a conventional long-term loan from Banterra in order to finance approximately $1.6 million of maturing short-term notes. The interest costs of the conventional loan exceeded those that the bond issue initially contemplated. Associated Warehousing timely brought suit thereafter, alleging breach of contract, breach of the covenant of good faith and fair dealing, and a variety of non-contractual claims.

## III. Contractual Claims

Associated Warehousing asserts that because the Second Terms Letter "simply represented a reiteration of, and incorporation of, agreements up to that point[,]" it constituted a valid contract that obligated Banterra to "do whatever was required to facilitate the bond issue" with AmSouth.

(Br. for Pl.-Appellant 20-21, 22.)  The district court concluded that the Second Terms Letter was too indefinite to constitute an enforceable contract between Associated Warehousing and Banterra.  *See Associated Warehousing, Inc. v. Banterra Corp.*, No. 5:08–CV–00052–TBR, 2010 WL 2745981, at *4 (W.D. Ky. July 9, 2010).  We agree.  To establish a breach of contract under Kentucky law, the plaintiff must show with clear and convincing evidence that a binding agreement existed between the parties.  *See Auto Channel, Inc. v. Speedvision Network, LLC*, 144 F. Supp. 2d 784, 790 (W.D. Ky. 2001).  In this case, by contrast, the Second Terms Letter was explicitly tentative – a self-described "preliminary proposed terms letter" that Banterra prepared to "facilitate . . . discussions of the possible terms of the credit."  This disclaimer appeared towards the end of the document and read  in its entirety as follows:

> PLEASE NOTE:  This preliminary proposed terms letter has been prepared to facilitate our discussions of the possible terms of the credit.  It does not cover all terms and conditions under which we contemplate any credit would be extended and is merely intended to provide the basis for further discussions.  In the course of our due diligence and consultation with legal counsel, we may become aware of facts or requirements which affect the structure, terms, and pricing of the transaction.  In any event, we need to obtain internal credit approvals as a condition to proceeding with the transaction and must inform you that at this time, given the preliminary nature of our discussions, such approval process has not been initiated.

Clearly, in light of this language, there was no agreement between the parties to be bound. To the contrary, Banterra's intent to *avoid being bound* is evident from the face of the document itself.

Further, to create a valid contract, "the parties must either agree upon the material terms or supply a 'definite method of ascertaining'" them.  *Cinelli v. Ward*, 997 S.W.2d 474, 477 (Ky. Ct. App. 1998) (quoting *Walker v. Keith*, 382 S.W.2d 198, 202 (Ky. 1964)).  The parties here did

neither. The Second Terms Letter expressly stated that "it [did] not cover all terms and conditions under which [Banterra] contemplate[d] any credit would be extended . . . ." And indeed, absent from it were a number of key terms, including a final amount for the letter of credit, an interest rate, and a closing date. The parties also failed to supply a standard or method for filling in these open terms should their negotiations fail.

Nonetheless, Associated Warehousing asks this court to consider external evidence of the parties' intent to create a binding contract. Specifically, it points out that "more than $1 million changed hands . . . a week after the [Second] Terms letter was generated, . . . and the contemplated warehouse construction soon followed." (Br. for Pl.-Appellant 23.) Under Kentucky law, the equitable doctrine of partial performance can render an otherwise unenforceable agreement binding on both parties. *See e.g.*, *Talamini v. Rosa*, 77 S.W.2d 627, 630 (Ky. Ct. App. 1934). We will assume, then, that Banterra's decision to close on the two short-term loans – a substantial performance of the financing agreement preliminarily outlined in the Second Terms Letter – obligated it to provide Associated Warehousing with some method for financing those debts on a long-term basis. Thus, the question is whether such partial performance bound the parties to a *particular* long-term financing relationship, *i.e.*, the bond issue.

We conclude that it did not. By July 2002, both Associated Warehousing and Banterra were aware that Banterra's "non-rated" status presented a hurdle to the bond transaction with AmSouth. (*See* Br. for Pl.-Appellant 6-7; Br. for Def.-Appellee 4.) But despite the parties' mutual knowledge of this fact, the Second Terms Letter failed to provide any information about how Banterra would insure its own letter of credit with that of a rated third party. Indeed, it did not even mention the

"non-rated" issue or the fact that AmSouth was the financial institution underwriting the loan. It did, however, explicitly state that "[i]n the course of our due diligence and consultation with legal counsel, we may become aware of facts or requirements which affect the structure, terms, and pricing of the transaction." The decision to retain such a high level of uncertainty in the Second Terms Letter is convincing evidence that the parties did not intend for that document to bind them to a specific long-term financing arrangement. In the end, Associated Warehousing received permanent financing for its construction project through a conventional loan from Banterra, albeit at a less favorable interest rate than it would have received with a bond issue. Further, Associated Warehousing presents no evidence that Banterra did not act in good faith when it negotiated with First Tennessee over the terms for obtaining a "wrap-around" letter of credit. *See Farmers Bank and Trust Co. of Georgetown, Ky., v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005) ("Within every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out.") Those negotiations lasted for approximately eight months before Banterra rejected First Tennessee's financing terms based on its conclusion that they contained "unexpected and rigorous requirements . . . ." (Br. for Def.-Appellee 6.) Associated Warehousing has not raised any genuine issues of material fact sufficient to survive summary judgment on its contractual claims.

## IV. Non-Contractual Claims

All of Associated Warehousing's non-contractual claims – deceit, negligent misrepresentation, and promissory estoppel – require a showing that Associated Warehousing reasonably relied on the Second Terms Letter and on Banterra's assurances that the bond issue would

go forward. *See Associated Warehousing, Inc.*, 2010 WL 2745981, at *5. The District Court held that any reliance on the Second Terms Letter by Associated Warehousing was not reasonable because Associated Warehousing was on prior notice that Banterra was a "non-rated" bank and could not alone provide the letter of credit necessary to secure the bond issue from AmSouth. *See id.* at *5-*6. Associated Warehousing argues on appeal that it nonetheless reasonably relied "on Banterra's conduct and representations over roughly an eight month period . . . that a wrap[-]around letter of credit would be procured from some outside source . . . ." (Br. for Pl.-Appellant 11.) We disagree with this assessment. Associated Warehousing is a sophisticated business entity that entered into an arm's-length negotiation to consummate a significant business deal. It was aware by June 2002 that Banterra was a "non-rated" bank and that procuring a "wrap-around" letter of credit was an obstacle to a successful bond issue. It took a calculated risk by moving forward with the two short-term loans. Associated Warehousing's non-contractual claims based on reasonable reliance simply do not present any trial-worthy questions of fact.

For the foregoing reasons, the decision of the district court is affirmed.