RENDERED:  JANUARY 29, 2021; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2020-CA-1453-WC

LHC GROUP, INC.                                                   APPELLANT


                             PETITION FOR REVIEW OF A DECISION
v.                   OF THE WORKERS' COMPENSATION BOARD
                               ACTION NO. WC-16-60946


ELIZABETH FLOYD; HON. GRANT
ROARK, ADMINISTRATIVE LAW
JUDGE; AND KENTUCKY
WORKERS' COMPENSATION                           APPELLEES
BOARD

OPINION
AFFIRMING

** ** ** ** **

BEFORE:  DIXON, KRAMER, AND LAMBERT, JUDGES.

DIXON, JUDGE:  LHC Group, Inc., ("LHC") petitions for review of the Kentucky

Workers' Compensation Board (Board) opinion entered October 16, 2020,

affirming the opinion, award, and order, and order denying reconsideration,

entered May 4, 2020, and June 8, 2020, respectively, by Administrative Law Judge

(ALJ) Grant S. Roark. It further petitions for review of the interlocutory opinion and the order denying reconsideration entered June 24, 2019, and July 18, 2019, respectively. Following review of the record, briefs, and law, we affirm.

## FACTS AND PROCEDURAL BACKGROUND

On May 4, 2015, Floyd injured her right shoulder, low back, and ankle when she fell down an elevator shaft while employed as a home health nurse by LHC. Floyd filed a workers' compensation claim for her injuries associated with that accident.

After obtaining medical treatment for her injuries sustained in the elevator accident—including surgery to her right shoulder—Floyd returned to part-time, light-duty work for LHC in April 2016. At the beginning of her workday on November 16, 2016, Floyd used her left arm to reach down to the floor to turn on her computer tower and then up to retrieve her headset from atop the computer monitor on her desk. Floyd experienced immediate, acute pain in her left shoulder due to the upward reaching movement. An MRI of her left shoulder taken shortly after the incident showed a full-thickness rotator cuff tear. Floyd pursued a second workers' compensation claim for the injury to her left shoulder caused by this incident. This appeal solely concerns the second workers' compensation claim.

On June 23, 2017, Dr. Ronald Burgess performed an independent medical evaluation ("IME") of Floyd. Floyd failed to disclose her medical history

of arthritis to Dr. Burgess at that time and denied pain in her left shoulder prior to November 16, 2016. Dr. Burgess opined that the mechanism described by Floyd did not cause her injury, and further, that her rotator cuff tear was not otherwise caused by her work.

Dr. Burgess was provided with additional medical records and performed a second IME of Floyd on August 15, 2018. Those records contained generalized mention of arthritis involving Floyd's hands, wrists, elbows, shoulders, hips, knees, ankles, feet, and low back, as well as prescriptions for Methotrexate and Humira, which predated the incident of November 16, 2016. Dr. Burgess noted Floyd's failure to disclose her treatment and medications for arthritis to him prior to or during the first IME, asserting this further undermined his confidence in the credibility of her version of events. He also opined Floyd's condition was the result of a degenerative tear, with her polyarthritis being a significant contributing factor. Dr. Burgess was subsequently deposed on January 23, 2019, at which time he again pointed out Floyd's failure to disclose her medical history concerning arthritis to him prior to the first IME. Dr. Burgess's deposition testimony was consistent with his IME reports.

Dr. Burgess performed yet another IME of Floyd on December 11, 2019, and he assigned an 11% whole person impairment rating. On January 20, 2020, Dr. Burgess authored a subsequent report opining that Floyd would be

unable to return to the work she performed on the day of the incident based on her job description.

On February 26, 2018, Floyd underwent an IME performed by Dr. Frank A. Burke. Floyd failed to disclose her medical history concerning arthritis to Dr. Burke at that time and denied pain in her left shoulder prior to November 16, 2016. Dr. Burke diagnosed Floyd with an acute work-related injury to the left rotator cuff caused by the November 16, 2016, incident. Dr. Burke further placed work restrictions on Floyd as she was unable to reach at or above waist level. He opined that she was unable to return to the same work she performed on the day of the incident.

After reviewing additional medical records concerning Floyd's arthritis, Dr. Burke authored an "Addendum to Independent Medical Evaluation of 2/26/18" dated April 18, 2019. Although the Addendum addressed these records, the ultimate diagnosis remained largely unchanged.[1] Dr. Burke also pointed out

---

[1] In pertinent part, the Addendum stated:

> The patient does have a history of an autoimmune arthritis, possibly psoriatic arthritis. This condition I am intimately familiar with as a patient with this condition, as well as a physician with a long history of treating such patients. The principle [sic] problem in autoimmune arthritis with respect to the joint is the weakening of the attachments of ligaments and tendons adjacent to the joint. This tendon was probably affected by her condition and was possibly weakened but had not had a symptomatic tear occur prior to 11/16/16. There is no evidence in the record from her rheumatologists, from Dr. Mary Lloyd-Ireland, or her given history to me that she had a problem in this left shoulder prior to this

that both of Floyd's shoulders had been examined by Dr. Ireland on November 2, 2016, just a few weeks before the incident, and no left shoulder problems were noted at that time.[2]

Floyd was evaluated by Dr. Burke again on October 21, 2019, following which he authored an "Independent Medical Reevaluation" report. At that time, Dr. Burke assigned Floyd an 11% whole person impairment rating. Dr. Burke's February 21, 2020, supplemental report reaffirmed the restrictions imposed on Floyd as set forth in the February 26, 2018, IME report.

Floyd testified by deposition on June 5, 2018, and at the hearing on April 24, 2019, that she had no complaints of pain in her left shoulder prior to the November 16, 2016, incident. Floyd also testified that she is unable to return to the work performed on the day of the incident since it involved waist-level and above reaching too painful to perform on a sustained basis.

accident of 11/16/2016. Any pre-existing condition was dormant and aroused due to the work-related injury of 11/16/2016.

I have an extensive history of treatment of individuals with this condition and although this mechanism of injury did not require any significant amount of force except for reaching, this is perfectly compatible with the type of injury, which was identified on physical examination and subsequent MRI imaging as an acute injury. Again, the MRI evidence is totally supportive of an acute injury to the anterior leading edge of the rotator cuff tendon supraspinatus.

[2] The purpose of Dr. Ireland's examination was a post-surgery follow-up of Floyd's right shoulder after the elevator accident.

On June 24, 2019, the ALJ entered an interlocutory order finding Floyd had indeed sustained a work-related injury to her left shoulder from the incident described above. LHC petitioned the ALJ to reconsider, asserting the left shoulder injury was not causally related to any work injury but, rather, due to a pre-existing, degenerative condition. On July 18, 2019, the ALJ entered an order denying reconsideration of the interlocutory order.

On March 4, 2020, a final hearing was held during which Floyd testified she was unable to return to her light-duty work for LHC because typing and using the phone would require the use of both arms all day and the pain would render her unable to concentrate.

On May 4, 2020, the ALJ entered an order awarding Floyd benefits based on an 11% whole person impairment rating with a three-multiplier pursuant to KRS[3] 342.730(1)(c)1 because she sustained a work-related injury to her left shoulder and was unable to return to the same work she performed at the time of the injury. LHC petitioned the ALJ to reconsider regarding causation and the three-multiplier. On June 8, 2020, the ALJ entered an order correcting a typo but otherwise denying reconsideration.

LHC appealed to the Board. On October 16, 2020, the Board entered its opinion affirming the ALJ's opinion, award, and order. This appeal followed.

---

[3] Kentucky Revised Statutes.

# STANDARD OF REVIEW

The appropriate standard of review for workers' compensation claims was summarized in *Bowerman v. Black Equipment Co.*, 297 S.W.3d 858, 866-67 (Ky. App. 2009).

> Appellate review of any workers' compensation decision is limited to correction of the ALJ when the ALJ has overlooked or misconstrued controlling statutes or precedent, or committed an error in assessing the evidence so flagrant as to cause gross injustice. *Western Baptist Hosp. v. Kelly*, 827 S.W.2d 685, 687-88 (Ky. 1992). Our standard of review differs in regard to appeals of an ALJ's decision concerning a question of law or a mixed question of law and fact *vis-à-vis* an ALJ's decision regarding a question of fact.
>
> The first instance concerns questions of law or mixed questions of law and fact. As a reviewing court, we are bound neither by an ALJ's decisions on questions of law or an ALJ's interpretation and application of the law to the facts. In either case, our standard of review is *de novo*. *Carroll v. Meredith*, 59 S.W.3d 484, 489 (Ky. App. 2001); *Cinelli v. Ward*, 997 S.W.2d 474, 476 (Ky. App. 1998). *De novo* review allows appellate courts greater latitude in reviewing an ALJ's decision. [*Purchase Transp. Servs. v. Estate of Wilson,* 39 S.W.3d 816, 817-18 (Ky. 2001); *Uninsured Employers' Fund v. Garland*, 805 S.W.2d 116, 117 (Ky. 1991)].
>
> The second instance concerns questions of fact. KRS 342.285 designates the ALJ as finder of fact, and has been construed to mean that the factfinder has the sole discretion to determine the quality, character, weight, credibility, and substance of the evidence, and to draw reasonable inferences from the evidence. *Paramount Foods, Inc. v. Burkhardt*, 695 S.W.2d 418, 419 (Ky. 1985); [*McCloud v. Beth-Elkhorn Corp.*, 514

-7-

S.W.2d 46, 47 (Ky. 1974)]. Moreover, an ALJ has sole discretion to decide whom and what to believe, and may reject any testimony and believe or disbelieve various parts of the evidence, regardless of whether it comes from the same witness or the same adversary party's total proof. *Caudill v. Maloney's Discount Stores*, 560 S.W.2d 15, 16 (Ky. 1977).

KRS 342.285 also establishes a "clearly erroneous" standard of review for appeals concerning factual findings rendered by an ALJ, and is determined based on reasonableness. *Special Fund v. Francis*, 708 S.W.2d 641, 643 (Ky. 1986). Although an ALJ must recite sufficient facts to permit meaningful appellate review, KRS 342.285 provides that an ALJ's decision is "conclusive and binding as to all questions of fact," and that the Board "shall not substitute its judgment for that of the [ALJ] as to the weight of evidence on questions of fact[.]" *Shields v. Pittsburgh & Midway Coal Mining Co.*, 634 S.W.2d 440, 441 (Ky. App. 1982). In short, appellate courts may not second-guess or disturb discretionary decisions of an ALJ unless those decisions amount to an abuse of discretion. [*Medley v. Bd. of Educ., Shelby County*, 168 S.W.3d 398, 406 (Ky. App. 2004)]. Discretion is abused only when an ALJ's decision is arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Downing v. Downing*, 45 S.W.3d 449, 454 (Ky. App. 2001).

. . . .

Generally, "arbitrariness" arises when an ALJ renders a decision on less than substantial evidence, fails to afford procedural due process to an affected party, or exceeds her statutory authority. [*K & P Grocery, Inc. v. Commonwealth, Cabinet for Health Serv.'s*, 103 S.W.3d 701, 703 (Ky. App. 2002)].

Substantial evidence is "that which, when taken alone or in light of all the evidence, has sufficient probative value to induce conviction in the mind of a reasonable person." *Bowling v. Nat. Res. & Envtl. Prot. Cabinet*, 891 S.W.2d 406, 409 (Ky. App. 1994). Our standard of review requires us to show considerable deference to the ALJ and the Board.

## WORK-RELATED INJURY

On appeal, LHC argues the ALJ erred in accepting Dr. Burke's opinions and rejecting Dr. Burgess's opinions. We first note that the proffered whole person impairment rating was the same from both experts—11%. We next note the ALJ discussed and specifically explained why he relied upon Dr. Burke's causation opinions, as opposed to those of Dr. Burgess. As we previously quoted, "an ALJ has sole discretion to decide whom and what to believe, and may reject any testimony and believe or disbelieve various parts of the evidence[.]" *Bowerman*, 297 S.W.2d at 866. Therefore, the ALJ was well within his discretion to accept Dr. Burke's opinions and reject those of Dr. Burgess.

Nonetheless, LHC contends the case herein is like *Cepero v. Fabricated Metals Corp.*, 132 S.W.3d 839, 842 (Ky. 2004). In *Cepero*, the claimant injured his left knee while practicing martial arts in a foreign country and was confined to a wheelchair for a few months during his recovery. A few years later, the claimant filed a workers' compensation claim alleging a left knee injury

following a trip and fall at work. The claimant was seen by at least five doctors after the fall and gave varying reports to each concerning the medical history of his left knee. The three doctors he told about his martial arts injury attributed his knee injury to that incident, while the two doctors he told only about the fall at work attributed his condition to that accident. One of the doctors to whom he disclosed only the fall at work was subsequently made aware of the martial arts injury and then opined the knee condition was not due to a work-related injury but, rather, to the prior martial arts injury. Nevertheless, the ALJ determined the claimant sustained a work-related injury relying solely on the opinions of the doctors without the full medical history concerning the left knee. The Court ultimately held:

> [I]n cases such as this, where it is irrefutable that a physician's history regarding work-related causation is corrupt due to it being substantially inaccurate or largely incomplete, any opinion generated by that physician on the issue of causation cannot constitute substantial evidence. Medical opinion predicated upon such erroneous or deficient information that is completely unsupported by any other credible evidence can never, in our view, be reasonably probable.

*Cepero*, 132 S.W.3d at 842. Since substantial evidence did not support the ALJ's finding that the work-related accident caused the claimant's left knee injury, the ALJ was reversed.

Here, it is undisputed that Floyd did not initially provide a detailed patient history or medical records concerning her prior treatment of arthritis to either Dr. Burgess or Dr. Burke. However, additional records and information were provided to each, and subsequent IMEs were performed by both prior to the hearings and awards herein. The additional records and the information contained therein were specifically addressed and accounted for by Dr. Burke. Therefore, the Board correctly determined that Dr. Burke's opinions were not "corrupt" as described in *Cepero*. The ALJ also noted that Dr. Burke personally reviewed the MRI of Floyd's left shoulder after the incident, whereas Dr. Burgess did not. Dr. Burke further opined that the mechanism described by Floyd was sufficient to cause her work-related injury and any pre-existing condition was dormant and not aroused until—and due to—the work-related injury. Accordingly, Dr. Burke's opinions constituted substantial evidence upon which the ALJ was fully entitled to rely in his award. Accordingly, we must affirm.

## KRS 342.730(1)(c)1 THREE-MULTIPLIER

LHC also asserts that the ALJ erred in awarding Floyd a three-multiplier under KRS 342.730(1)(c)1, which states,

> If, due to an injury, an employee does not retain the physical capacity to return to the type of work that the employee performed at the time of injury, the benefit for permanent partial disability shall be multiplied by three (3) times the amount otherwise determined under paragraph (b) of this subsection, but this provision shall

-11-

not be construed so as to extend the duration of payments[.]

The Board analyzed the ALJ's application of KRS 342.730(1)(c)1 in its award, observing:

> As held by the Kentucky Supreme Court in the case of *Ford Motor Co. v. Forman*, 142 S.W.3d 141, 145 (Ky. 2004), "[w]hen used in the context of an award that is based upon an objectively determined functional impairment, 'the type of work that the employee performed at the time of injury' was most likely intended by the legislature to refer to the actual jobs that the individual performed." The plain language of the statute and the pertinent case law requires the ALJ to analyze the *actual tasks* Floyd performed prior to the work-related injury. [*Voith Indus. Servs., Inc. v. Gray*,] 516 S.W.3d 817 (Ky. App. 2017).
>
> In the May 4, 2020, decision, the ALJ, in his analysis of the applicability of the three multiplier, noted Floyd's pre-injury tasks included typing at waist level. He determined Floyd is unable to return to the type of work she was performing at the time of her injury (i.e. typing), because she testified that she had difficulty performing typing at waist level. Indeed, Floyd unequivocally testified during her deposition and at the hearing that she does not believe she can perform her pre-injury tasks of typing and answering the phone because these tasks are performed above waist level. An ALJ enjoys the authority to give substantial weight to a claimant's testimony regarding her retained physical capacity and occupational disability. *Hush v. Abrams*, 584 S.W.2d 48 (Ky. 1979). Further, a claimant's post-injury testimony is competent evidence as to whether he or she retains the physical capacity to return to the type of work performed at the time of injury. *Carte v. Loretto Motherhouse Infirmary*, 19 S.W.3d 122 (Ky. App. 2000).

-12-

Further, Floyd's testimony regarding her inability to type at waist level is consistent with Dr. Burke's opinions set forth in the February 26, 2018, IME report that the November 16, 2016, injury prevents Floyd from returning to her pre-injury job "that requires repetitive use of the left shoulder, e.g. reaching or typing above waist level." Dr. Burke reaffirmed his opinions in the April 18, 2019, Addendum, October 21, 2019, IME report, and the February 21, 2020, Addendum.

As both Floyd's and Dr. Burke's opinions on the issue of the ALJ's award of Floyd's ability to perform her pre-injury job tasks constitute substantial evidence supporting the ALJ's decision to award the three multiplier, we must affirm.

Contrary to LHC's assertions, the ALJ and Board correctly interpreted KRS 342.730(1)(c)1 and appropriately applied it to the case herein. Floyd was restricted by Dr. Burke, as well as by Dr. Ireland, from performing tasks with her left shoulder that involved repetitive movement at or above waist level. Floyd testified she was unable to repetitively perform waist-level and above tasks, such as typing and using the phone, as she did for LHC at the time of her second work-related injury. The Board did not err in its determination that the ALJ was entitled to rely on that evidence in determining Floyd was unable to return to the type of work that she performed at the time of injury, qualifying her for the three-multiplier under KRS 342.730(1)(c)1. Consequently, we affirm.

-13-

## CONCLUSION

For the foregoing reasons, the opinion of the Workers' Compensation Board is AFFIRMED.

ALL CONCUR.

BRIEF FOR APPELLANT:

Mark R. Bush
Clarke D. Cotton
Ft. Mitchell, Kentucky

BRIEF FOR APPELLEE
ELIZABETH FLOYD:

Mark D. Knight
Somerset, Kentucky